990 P.2d 1158

**CHILD SUPPORT ENFORCEMENT AGENCY, State of Hawai'i, Petitioner,**

**and**

**Jane Doe, Mother, Petitioner-Appellant,**

**v.**

**John DOE, Father, Respondent-Appellee**[1]

**No. 22084.**

Intermediate Court of Appeals of Hawai'i.

Nov. 30, 1999.

As Amended Dec. 1, 1999.

1. For the purpose of maintaining confidentiality, we use "Mother," "Father," and "Child" in place of the actual names of the parties.

Jane Doe, on the briefs, for petitioner-appellant, pro se.

Donald M. Card, Honolulu, on the briefs, for defendant-appellee.

BURNS, C.J., ACOBA, and LIM, JJ.

Opinion of the court by ACOBA, J.

We hold first, that a social study must be ordered by the family court of the first circuit (the court) to determine whether the visitation rights of Petitioner–Appellant Jane Doe (Mother) concerning the female child (Child) must be modified. Second, we hold that a rebuttable presumption favoring a credit against child support applies with respect to social security disability payments paid on behalf of the obligor parent. Because the court rejected the request by Mother for such a credit, we remand this case for consideration of the presumption. On remand, if the court imposes the presumption, we also instruct it to (1) apply the presumption to Mother's obligation to pay any unreimbursed medical expenses of Child, (2) credit child support payments already paid by Mother to future child support payments, (3) determine what credit if any should be given Mother for a lump sum social security disability payment received by Respondent–Appellee John Doe (Father), and (4) determine whether changes in circumstances require a modification in the existing child support order.

I.

On May 1, 1987, a paternity proceeding was initiated by Mother against Father.

Mother and Father never married. At a hearing on July 10, 1987, the court awarded Mother temporary custody of Child pending an investigation and report by the Adult Services Branch of the court, and Father was given visitation rights. A social study was conducted and on October 9, 1987, a report was filed.

At a hearing on November 15, 1987, Father acknowledged paternity of Child. A stipulated custody order filed February 10, 1988, awarded Mother sole physical and legal custody of Child, and ordered Father to pay $266.84 per month as child support.

On January 12, 1989, Mother filed a motion to modify Father's visitation arrangements in anticipation of Mother and Child's relocation to the mainland United States. Both were scheduled to leave Hawai'i on May 31, 1989. After a hearing held on March 17, 1989, the court found the move constituted a material change in circumstances and modified the visitation schedule.

Mother and Child lived together in Arizona until December 1997. On December 17, 1997, Child was scheduled to leave for Hawai'i to visit Father. However, Mother advanced Child's trip to December 11, 1997 because she was "[a]fraid for the minor child's well being[.]" Mother then requested that Father "keep the minor child until the end of the 1997–1998 school year[.]"

On January 24, 1998, Father sent Mother a letter requesting "some sort of legal document to make decisions on [Child's] behalf." In the letter, Father also asked if Mother would consent to giving him custody of Child. During a telephone conversation on January 28, 1998, Mother told Father's wife she desired that Child return to Arizona immediately. Father did not send Child back to Arizona. Instead, on January 30, 1998, Father filed a motion to obtain custody of Child and to require Mother to pay child support and a portion of Child's medical costs.

On March 19, 1998, Mother and Father signed a child support guidelines worksheet (March 19 worksheet) which calculated Moth-er's child support obligation at $240 per month. The record does not indicate who completed the March 19 worksheet.

A hearing on Father's motion was held on March 19, 1998. The court minutes obliquely refer to the March 19 worksheet, indicating that child support was $240. The court minutes further show that child support was to be reduced to $100, and states, "[D]ue to mother's medical bills court found exceptional circumstances."

The minutes regarding child support were memorialized in an order filed April 1, 1998 (the child support order). According to the child support order, Mother was required to pay support in the amount of $100 per month, and the exceptional circumstance warranting deviation from the family court support guidelines was noted as "Mother['s] substantial medical expenses as a result of her medical condition." The court also ordered Father's child support obligation terminated as of January 30, 1998.

The court's orders regarding other terms of custody stemming from the March 19, 1998 hearing were set forth in an April 15, 1998 "Order for Post–Judgment Relief" (the April 15 Order). In it, the court granted Father sole physical and legal custody of Child, ordered Father to provide medical insurance for Child, and further directed that any unreimbursed medical expenses be shared equally between the parents. The April 15 Order included a restraining order prohibiting Mother from removing Child from Honolulu. Mother was also limited to supervised visitation and to biweekly telephone calls on Wednesdays and Sundays at 6:00 p.m. Hawai'i time. The court then issued an "Order for Income Withholding," requiring Mother's employer to withhold $100 a month from Mother's salary and to send it to the Child Support Enforcement Agency in Honolulu.

On September 8, 1998, Mother, appearing pro se, filed a motion to set aside the restraining order and to adjust her visitation rights. Mother requested the court to allow unsupervised visitations, to permit visitations

outside of Honolulu, or if visitations were limited to Honolulu, to require Father to pay Mother's expenses for the visits, and to remove the telephone restrictions. Additionally, Mother requested that she be given credit against her support obligation in the amount of social security disability payments paid directly to Father for Child on account of Mother's disability. The disability payments totalled $579 per month.

Mother's motion was set for hearing on November 5, 1998. However, Mother did not appear at the hearing and on November 13, 1998, the court denied her motion because of her nonappearance.

On November 13, 1998, the court issued an order directing that its orders on visitation, child support, and unreimbursed medical expenses continue unchanged. Further, the order added a prohibition against Mother meeting or leaving Child at Father's home at the beginning and end of Mother's visitations.

On November 19, 1998, Mother, appearing pro se, filed an appeal from the November 13, 1998 order. In her opening brief, Mother was not precise in pointing out the specific issues that are to be addressed, but we discern that Mother desires (1) the telephone restrictions on her contacts with Child be removed, (2) unsupervised visitations and visitations outside of Honolulu be permitted, (3) a social worker be assigned to the case, (4) credit be given against her child support obligation in the amount of social security disability payments received by Father on behalf of Child, (5) child support be recalculated because her income has changed substantially, and (6) Father be required to pay all of Child's medical and dental bills. We

believe the record was sufficient for the court to have ruled on Mother's motion.

At the time of this appeal, Child lived in Hawai'i with Father and his wife and son, and Mother lived in Arizona.[2]

## II.

■ The issues Mother raises concerning telephone restrictions, visitation rights, and assignment of a social worker are common to child custody orders.

The only social study conducted was in September 1987, more than twelve years ago. No updated social study has been done despite the substantial change in circumstances occurring since 1987. Child now resides with Father and his family in Hawai'i and extensive restrictions have been placed on Mother's visitation rights.[3] In light of the foregoing facts, we instruct, on remand, that the court order an updated social study to consider Mother's requests and to determine, in the present situation, what provisions as to visitation would be in the best interest of the Child.

## III.

■ In connection with the remaining issues, we first conclude that a disabled parent, subject to a child support obligation, should be given credit against that obligation for social security disability benefits paid on account of the parent to the child or a representative payee.

## IV.

### A.

Hawai'i law invests the family court with authority to establish child support guidelines:

2. With Mother's November 24, 1998 notice of appeal, she included a letter to the Hawai'i Supreme Court stating her intent to return to Hawai'i. It does not appear that this information was ever raised during lower court proceedings or properly made a part of the record. On May 3, 1999, this court issued an order "admonish[ing Mother] against submitting additional evidence [on] this appeal." Therefore, any subsequent filings by Mother, including any representation as to her then-present residence was not considered by this court.

3. According to the "Order for Post-Judgment Relief" filed April 15, 1998, Mother is only allowed supervised visitation in Honolulu. The restrictions may be modified only after both Mother's and Child's therapists agree, after consultation, that unsupervised visitation or visitation outside Honolulu is in Child's best interest.

The family court, in consultation with the [child support enforcement] agency, *shall establish guidelines* to establish the amount of child support when an order for support is sought or being modified under [Hawai'i Revised Statutes (HRS) chapter 576D]. The guidelines shall be based on specific descriptive and numeric criteria and result in a computation of the support obligation.

HRS § 576D–7(a) (1993) (emphasis added). This statute was part of a bill promulgated with the intent "to achieve full compliance with Title IV–D" of the federal Social Security Act, which imposed requirements on state child support enforcement programs. Sen. Stand. Comm. Rep. No. 426–86, in 1986 Senate Journal, at 964. A legislative committee report acknowledged that the family court was to establish the child support guidelines, and noted that "a committee on the Family Law Section of the Hawaii State Bar Association work[ed] in conjunction with the family court to revise existing guidelines[.]" Sen. Conf. Comm. Rep. No 180–86, in 1986 Senate Journal, at 843.

The trial courts are mandated by law to adhere to the guidelines. HRS § 571–52.5 (1993) provides that "[w]hen the court establishes or modifies the amount of child support required to be paid by a parent, the court shall use the guidelines established under section 576D–7, except when exceptional circumstances warrant departure."

### B.

The child support guidelines in effect when this case was pending in the court were the

November 1, 1994 "Guidelines in Determining Child Support" (the 1994 Guidelines). The 1994 Guidelines state that the monthly gross income of a party includes "income from all sources, including but not limited to employment salary or wages, pensions ... except public benefits based only in [sic] need, such as [Aid to Families with Dependent Children], General Assistance, [Social Security income], Section 8 housing and Food Stamps." 1994 Guidelines at 3. On the March 19 worksheet, Mother's gross income is listed at $2256 per month.[4]

Child support obligations are determined from net income. 1994 Guidelines at 4. Net income is determined from the 1994 Guidelines Table of Net Incomes. The March 19 worksheet indicates that Mother's net income was $1036 per month. The determination of net income of both parents then allows for calculation of the total amount available for primary support, which in the present case, was $2887 per month. Each parent's relative ability to pay child support was calculated, and the March 19 worksheet indicated that Mother was responsible for 36% of Child's primary support, which amounted to $90 per month.

The 1994 Guidelines then allow for a Standard of Living Allowance (SOLA). In the present case, Mother's SOLA was calculated at $1,574 per month.[5] After deducting the $90 primary support obligation and a $204 federal tax dependency exemption, Mother's "net" SOLA was calculated at $1,280 per month. This amount was then multiplied by 12% to determine Mother's SOLA obligation, which was $154 per month. Adding $154 to the primary support obligation of $90 result-

---

**4.** The child support guidelines worksheet, signed by both Mother and Father on March 19, 1998 (March 19 worksheet), does not reveal the source of Mother's gross income of $2256 per month. The amount of Father's gross income is obtained from his income and expense statement. The source of Mother's income is not evident. Mother's annual income is stated to be $27,180.67, which divided by twelve, amounts to $2,265 in gross monthly income. If so, then the gross income amount of $2,256 stated on the March 19 worksheet was in error.

**5.** As stated previously, the March 19 worksheet does not expressly indicate the source of Moth-

er's gross income, *see supra* note 4, therefore we cannot determine whether Mother's income was reduced for social security payments. Further, we observe that the $1,574 Standard of Living Allowance (SOLA) figure used in the March 19 worksheet was incorrect. The 1994 Guidelines provide that for Mother's net income of $1,036, the corresponding SOLA should be $1,534 per month. The March 19 worksheet, however, incorrectly states the SOLA amount of $1,574, which corresponds to a net income of $1,057 per month.

ed in a total child support obligation of $244, which was rounded down to $240 per month.

In referring to the $240 child support amount at the March 19 hearing, the court was obviously cognizant of the 1994 Guidelines. The court order of $100 as child support was apparently a deviation allowed in the 1994 Guidelines for exceptional circumstances. 1994 Guidelines at 9.

## C.

As previously indicated, Mother's appeal includes a request that she be given a credit against her child support obligation in the amount of the social security disability payments. The 1994 Guidelines did not address disability benefits. The guidelines now in effect are "The 1998 Amended Child Support Guidelines" issued on November 1, 1998, which became effective on January 1, 1999 (the 1998 Guidelines). The 1998 Guidelines expressly *include* "[s]ocial security benefits received by the party" as a form of gross income. 1998 Guidelines at 2. However, the 1998 Guidelines provide that "any social security benefits received directly by the child on account of the payor's ... disability" are to be subtracted from the payor's *income.* 1998 Guidelines at 7 (emphasis added).

Thus, under the current guidelines, a parent may still be obligated to make payments for child support despite the fact that, as in this case, the social security benefits received by the child far exceed the disabled parent's support obligation. We believe the better reasoned rule and equity require that social security disability payments for the child's benefit must be treated as a credit against the child support payment of the disabled parent. It is inequitable to withhold a credit against the support obligation because such payments may be the only means by which a disabled parent may satisfy the obligation:

The purpose of social security disability payments is to replace income lost due to the recipient's inability to work. *Horton v. Horton,* 219 Ga. 177, 132 S.E.2d [200,] 201 [ (Ga.1963) ]. Although a recipient of disability benefits might have independent sources of income, commonly the disabled person is deprived of the only means of support upon becoming disabled. Therefore, it is inequitable to withhold a credit against the child support obligation. The parent charged with the support obligation may have no ability to satisfy that obligation other than through the governmental disability payments, which were effectively generated by contributions from wages while working.

*Weaks v. Weaks,* 821 S.W.2d 503, 506 (Mo. 1991). We also believe this approach is more logical because such disability payments are not merely another source of income as they are treated under the 1998 guidelines, but represent "a substitute for [Mother's] lost earning capacity." *In re Marriage of Cowan,* 279 Mont. 491, 928 P.2d 214, 221 (1996).

## V.

We conclude, then, like the majority of states that have examined this question, that the disabled obligor parent is normally entitled to credit for social security disability payments, at least for benefit payments that are contemporaneous with that parent's support obligation.[6] Annotation, *Right to Credit on Child Support Payments for Social Security or Other Government Dependency Payments Made for Benefit of Child,* 34 A.L.R.5th 447, 469 (1995) [hereinafter *Right to Credit* ]. *See e.g., Pacana v. State,* 941 P.2d 1263 (Alaska 1997); *In re Marriage of Henry,* 156 Ill.2d 541, 190 Ill.Dec. 773, 622 N.E.2d 803 (1993); *Miller v. Miller,* 929 S.W.2d 202 (Ky.Ct.App.1996); *Rosenberg v. Merida,* 428 Mass. 182, 697 N.E.2d 987

---

**6.** According to Annotation, *Right to Credit on Child Support Payments for Social Security or Other Government Dependency Payments Made for Benefit of Child,* 34 A.L.R.5th 447, 469–70 (1995), the following states have held that the obligor parent is entitled to credit: Alabama, California, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, Michigan, Mississippi, Montana, Nebraska, New Mexico, Ohio, Rhode Island, South Dakota, Tennessee, and Washington.

(1998); *Holmberg v. Holmberg,* 578 N.W.2d 817 (Minn.App.1998); *In re Cowan,* 928 P.2d 214; *Pontbriand v. Pontbriand,* 622 A.2d 482 (R.I.1993); *Crago v. Donovan,* 594 N.W.2d 726 (S.D.1999).

### A.

Of the courts following the majority rule, most apply the rule as a rebuttable presumption in favor of allowing the credit rather than treating such disability payments as a change in circumstances requiring the convening of a modification proceeding. *Right to Credit, supra,* at 482. The courts which adopt the rebuttable presumption approach view the requirement of a modification proceeding as an unduly harsh one to impose on a disabled parent. As the Montana Supreme Court stated:

> To impose the requirement of a court proceeding, i.e., modification hearing, on a party seeking to credit disability payments received by the custodial parent for the benefit of the parties' children is overly harsh. *In situations involving disability benefits, the party seeking credit most likely faces a reduction of income, financial uncertainty, physical or mental impairment and other attendant consequences of the disability. The additional burden of petitioning the court for a modification typically wastes time and money and helps no one.*

*In re Cowan,* 928 P.2d at 220 (citing *Weaks,* 821 S.W.2d at 506–07) (emphasis added).

The Alaska Supreme Court has expressed a similar view, observing that the disability payment process is lengthy and complex:

"[I]n most cases the obligor parent who qualifies for social security disability payments will have significant health and financial problems. *It may be difficult for a disabled obligor to make a formal and timely modification motion in order to receive a credit.* If the parent has been incapacitated, it may be impossible. *Moreover, the process for receiving disability payments is long and complex, and the likelihood of filing a timely motion to receive proper credit is low.*" Under the rebuttable presumption view, there is a presumption that credit will be allowed but it is rebuttable under appropriate circumstances.

*Right to Credit, supra,* at 480 (quoting *Pacana,* 941 P.2d at 1266) (emphases added).

### B.

■ Like Hawai'i, Montana mandates that the trial courts are required to consider the state's child support guidelines.[7] *In re Cowan,* 928 P.2d at 218. In that context, the Supreme Court of Montana has applied the majority rule, as follows:

> [T]he Social Security benefits received by [the] children were paid as a result of [payor parent] Arden's disability and were a substitute for Arden's lost earning capacity. Accordingly, *we hold that those benefits should be treated as a contribution from Arden toward the support of his children and should serve as a credit toward Arden's monthly obligation. We further hold that the substitution of the Social Security benefits for Arden's child support*

---

**7.** Montana Code Annotated § 40–4–204(3) (1997) provides as follows:

(a) *Whenever a court issues or modifies an order concerning child support, the court shall determine the child support obligation by applying the standards in* this section and *the uniform child support guidelines* adopted by the department of public health and human services pursuant to 40–5–209. The guidelines must be used in all cases, including cases in which the order is entered upon the default of a party and those in which the parties have entered into an agreement regarding the support amount. . . . The amount determined under the guidelines is presumed to be an ade-

quate and reasonable support award, unless the court finds by clear and convincing evidence that the application of the standards and guidelines is unjust to the child or to any of the parties or that it is inappropriate in that particular case.

(b) If the court finds that the guideline amount is unjust or inappropriate in a particular case, it shall state its reasons for that finding. . . . Findings that rebut and vary the guideline amount must include a statement of the amount of support that would have ordinarily been ordered under the guidelines.

(Emphasis added.)

*obligation does not constitute a retroactive modification of the District Court's original child support order, and was therefore immediately effective* as a credit against Arden's child support obligation.

In this case, because Arden's monthly $250 child support obligation was completely offset by the monthly $512 Social Security benefit paid to his children, *we hold that Arden was not liable for any contributions after the Social Security benefits began.* We therefore hold that Arden should be credited for any contributions made by him personally since that time and that those credits should be applied to Arden's accrued arrearages.

*Id.* at 220–21 (citations omitted) (emphases added). The Supreme Court of Montana held such "a credit for Social Security benefits does not retroactively modify the disabled parent's monthly child support obligation; *it merely changes the source of the payments." Id.* at 220 (emphasis added). We believe the disability payments made in the instant case should be similarly treated.

Other courts have also reasoned that the "credit does not involve either the retroactive establishment or modification of an existing child support order, but merely changes the source and the payments." *Id. See Crago,* 594 N.W.2d at 731 (holding that the "increased Social Security benefits were immediately effective against Father's child support obligation ... [and did] not constitute a retroactive modification"); *Rosenberg,* 697 N.E.2d at 990–91 (adopting "majority position of allowing a credit to the noncustodial parent" for social security disability benefits); *Pontbriand,* 622 A.2d at 485 (holding that the obligor parent is "not seeking a reduction or suspension of payments but rather a credit for the change in source of payments [therefore n]o modification is necessary[ ]"); *In re Henry,* 190 Ill.Dec. 773, 622 N.E.2d at 808 (distinguishing between "crediting an obligation with payment made from another source and increasing, decreasing, or terminating or otherwise modifying a specific dollar amount[,]" and holding that crediting social security benefits was not retroactive modification).

## VI.

We are aware of other approaches to this issue.

A minority of courts are of the opinion that allowance of a credit is a factor to be considered by the trial court in the exercise of its discretion. *See e.g., Miller v. Miller,* 385 So.2d 54 (Ala.Civ.App.), *cert. denied,* 385 So.2d 56 (Ala.1980); *Moritz v. Moritz,* 368 N.W.2d 337 (Minn.Ct.App.1985); *Lainson v. Lainson,* 219 Neb. 170, 362 N.W.2d 53 (1985); *Joachim v. Joachim,* 57 A.D.2d 546, 393 N.Y.S.2d 63 (1977), *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1242, 55 L.Ed.2d 767 (1978); *Arnoldt v. Arnoldt,* 147 Misc.2d 37, 554 N.Y.S.2d 396 (App.Div.1990); *Nibs v. Nibs,* 625 P.2d 1256 (Okla.1981).

But as one court explained,

[t]he cases which have held to [disallow a credit] have generally done so, not because they rejected, as a matter of law, the principal that Social Security benefits are allowable as a credit, but for other reasons, such as to permit a credit would retroactively modify the decree granting child support, or would cause an inequitable result when considering other factors.

*Wilson v. Stenwall,* 868 P.2d 1317, 1319 (Okla.App.1992) (citations omitted). *But see Weaks,* 821 S.W.2d at 506 (holding that it would be inequitable to deny a credit for disability benefits because the benefits may be the only means to satisfy the child support obligation).

Another court has rejected the presumptive credit rule, but held that "[t]he proper approach is to apply the child support guidelines and, if the application would be unjust or inappropriate, deviate from them" as allowed by the state's guidelines. *Drummond v. State,* 350 Md. 502, 714 A.2d 163, 175 (1998). A third court has recognized that disability benefits as opposed to social security *retirement* benefits, may be deserving of credit treatment:

We can envisage a social security disability recipient parent making a stronger case

for a credit than a social security retirement recipient[.] ... Suffice it to say here that disability may affect the parent's and child's standard of living in dramatically different ways than retirement, giving rise to a stronger claim for credit.

*Stultz v. Stultz*, 659 N.E.2d 125 (Ind.1995).

■ We believe any objections at the crux of the foregoing views may be satisfied by the rebuttable nature of the presumption. Therefore, in considering the different views pertaining to this issue, we adopt the majority view which establishes a rebuttable presumption in favor of allowing a credit.[8]

## VII.

■ In the case before us, Father argues that allowing a credit (1) would be a windfall for Mother because the benefits are not directly provided by Mother and (2) may result in a hardship for Father if he is not allowed to use the funds for general living expenses. Father claims, "[Allowing a credit] could also result in a hardship for Father if he is not permitted to use the social security funds for general living expenses *of his family* and is also deprived of child support payments from [Mother], which may be used for general living expenses." (Emphasis added.)

In arguing against allowing a credit, Father relies on *Fowler v. Fowler*, 156 Conn. 569, 244 A.2d 375 (1968), in which the court refused credit to the obligor parent. In 1959, the father in that case was ordered to pay $2.50 per week for each of his two children. *Id.* at 376. In 1965, the father qualified for social security disability status and the mother received monthly payments of $105 for his disability. *Id.* From 1959 to 1965, the father failed to pay any child support payments ordered by the court. *Id.* In 1967, he was ordered to appear before the court to show cause why he should not be found in contempt for failure to comply with the court's order. *Id.* The court found the father in contempt and ordered him to pay $1 per week on the amount found in arrears and $5 per week for future payments. *Id.* The father appealed, claiming that credit should be given for the social security disability payments. *Id.*

The Supreme Court of Connecticut refused to allow a credit because the father, for more than five years, completely ignored the 1959 court order and did not move for a modification of the support order at any time. *Id.* at 377. The appellate court stated that the father had made no payments from his personal funds and the children received nothing until payments from the Social Security Administration were initiated. *Id.* The court then stated:

*This conclusion relates only to the factual situation of the instant case. The trial court did not conclude as a matter of law, as the defendant claims, that such payments are not allowable as a credit to the defendant in fulfillment of a court-ordered payment where the factual situation justifies such an order.* ... [S]uch social security payments made by the federal government were earned in part by the defendant himself and are not altogether a gift from the federal government. Within the sound discretion of the trial court, such payments may properly be considered in determining the extent of the obligation of a parent to support minor children, together with the estate of the husband, his income, age, health and earning capacity and the age, health, station and separate estate of the wife.

*Id.* (emphasis added) (internal quotation marks and citations omitted).

The facts of the present case are distinguishable from those in *Fowler*. Mother filed a request for a modification on September 8, 1998, within a short period of time of

---

**8.** In adopting this rule, we do not intend to hinder the family court's implementation of child support guidelines as established under Hawai'i Revised Statutes § 576D-7 (1993). To the extent the credit must be accommodated with guideline considerations, the family court, at least initially, is charged with determining how best this may be accomplished in each case.

the initial child support order of April 1, 1998. The record does not indicate that Mother disobeyed a court order to pay child support. The Supreme Court of Connecticut plainly limited *Fowler* to the specific facts of the case and recognized that under appropriate circumstances, credit should be allowed. *Id.*

### VIII.

#### A.

Father has been receiving monthly social security payments on behalf of Mother for Child in the amount of $579, in addition to the $100 child support obligation paid by Mother. Allowing a credit for the $100 monthly child support obligation in this case would not be a windfall for Mother because, as reasoned by the majority of jurisdictions, the social security payments were generated by Mother's own earnings. *See e.g. In re Henry,* 190 Ill.Dec. 773, 622 N.E.2d at 809 (stating that "social security dependent disability benefits are earned by the noncustodial parent ... paid at least in part with contributions from the noncustodial's own earnings"); *Miller v. Miller,* 890 P.2d 574, 577 (Alaska 1995) (holding that "[social security benefit] payments themselves represent earnings from the parent's past contributions"); *In re Allsup,* 926 S.W.2d 323, 328 (Ct.App. Texas 1996) (stating that "these [social security] benefits are generated by the work of the parent").

Assuming *arguendo* Father is entitled to child support for his family's *general living expenses,* he has not provided any evidence of hardship which might possibly arise from his inability to use the payment for general living expenses. Under the rule we adopt, Mother must receive credit towards her child support obligation for payments that are contemporaneous with her support obligation.

We believe that a court order to effectuate such a credit would ordinarily suffice, without the need for a hearing. Of course, a challenge by the party receiving such payment on behalf of the child based on rebutting evidence or as to the appropriate amount of the credit may require the convening of a court hearing.

#### B.

■ In the present case, Mother is required to pay one-half of Child's unreimbursed medical expenses. Medical expenses appear to be included in the definition of "child support" as defined in HRS § 576D–1 (Supp.1997). HRS § 576D–1, which applies to this case, states:

> "Child support" means payment for the necessary support and maintenance of a child as required by law that includes but is not limited to spousal support when ordered in conjunction with child support or medical support when a court or administrative order requires the debtor parent to pay an amount in lieu of providing medical insurance coverage or to reimburse for maternity and delivery expenses incurred when the debtor parent's child was born.

Thus, Mother should be allowed credit based on social security disability payments for any of Child's unreimbursed medical expenses which are a component of child support. We conclude then, that if there are any unreimbursed medical expenses for Child that Mother is required to pay during a particular month, the disability payments made for that month shall be credited against such obligation.

#### C.

In this case, the monthly social security payment is greater than the child support ordered by the court. The question remains as to the treatment of the excess portion of the payment, after the credit has been made for child support and Mother's share of any unreimbursed medical expenses.

■ The majority of courts treat the excess payment as a gratuity to the child so that the custodial parent is not obligated to repay the obligor parent the excess. *Pacana,* 941 P.2d at 1266 (citing *Weaks,* 821

S.W.2d at 507, *Andler v. Andler,* 217 Kan. 538, 538 P.2d 649, 654 (1975); *Children and Youth Servs. of Allegheny County v. Chorgo,* 341 Pa.Super. 512, 491 A.2d 1374, 1379 (1985)).[9] As a general matter, we agree with the majority of courts and conclude, further, that the amount of social security disability payments in excess of a child support obligation shall be deemed a gratuity to the child or children involved.

## IX.

■ The record further indicates that Mother's employer was ordered by the court to withhold $100 per month from her paycheck, but it is unclear as to when the company began withholding such an amount. For the months in which Mother's employer withheld $100 and Father also received social security disability payments, the court shall consider the $100 payments as a credit against Mother's future child support payments. In the event credit for disability payments is confirmed on remand, the order for income withholding should be terminated by the court.

## X.

Mother was provided long-term disability insurance payments by her employer's insurance carrier (the insurance company). Upon the award of social security disability benefits, the insurance company recalculated Mother's payments as apparently permitted under her policy, by reducing her monthly insurance payments by the amount of monthly disability benefits paid. The insurance company asserts that because of the retroactive award of disability benefits, Mother was overpaid under the insurance policy. The insurance company claims overpayment for the period from January 1, 1997 through May 31, 1998 amounted to $9,622.

Father received for Child a lump sum disability payment of $10,851. According to Father's affidavit, the lump sum payment should cover the time period from December 1996 to July 1998. Although Mother directed him to remit the entire lump sum to the insurance company, Father stated he kept approximately $4000 to cover that period when Child was in Father's custody.

Mother asserts that Father did not pay her insurance company the correct amount.[10] Because the insurance company has not been fully repaid, the benefits payable under the insurance policy to Mother of approximately $556 a month have been withheld by the insurance company. The factual questions raised by the foregoing controversy must be determined by the court to the extent it affects credit to be given her for the lump sum retained by Father and it impacts Mother's gross income.

## XI.

On remand, the court may be required to recalculate the child support owed by Mother, who asserts there has been a change in circumstances. Two reasons support Mother's argument. First, the April 19 worksheet was completed using the 1994 Guidelines; however, new guidelines were adopted November 1, 1998 and became effective January 1, 1999. On remand, the court may choose to recalculate Mother's obligation pursuant to HRS § 576E–14(c)(1993), which provides:

---

9. The majority of courts do not allow the application of excess benefits to reduce arrearages that accrued before the disability. *In re Marriage of Cowan,* 279 Mont. 491, 928 P.2d 214, 221 (1996). The reason is that "[t]he Social Security disability payments belong to the children. To allow any part of that money to be credited towards the [obligor's] arrearage which was due prior to [his or her] date of disability would be in essence, requiring the children to purge the [obligor] of contempt." *Windham v. Alabama,* 574 So.2d 853, 855 (Ala.Civ.App.1990). We are not faced with this issue and do not decide it.

10. Father asserts in his affidavit that he repaid Mother's employer's long-term disability insurance carrier (the insurance company) the amount of $6,798. A letter from the insurance company to Mother dated August 5, 1998 states, "Thank you for your check in the amount of $6,798.00 for reimbursement of the overpayment of your Long Term Disability claim. This amount has been applied to your account and your overpayment has been reduced to $2,824.00."

The establishment of the guidelines or the *adoption of any substantive modifications made to the guidelines set forth in section 576D-7 may constitute a change in circumstances sufficient to permit review of the support order.* The most current guidelines shall be used to calculate the amount of the child support obligation.

(Emphasis added.) Under the foregoing statute, the court must use the 1998 Guidelines [11] for Mother's obligations arising after January 1999.

Second, Mother claims that her income has substantially changed since the April 1, 1998 $100 child support order. The order was based on the completion of the 1994 Guidelines worksheet. As stated before, the monthly gross income attributed to Mother on that calculation was $2256. Since the April 15, 1998 order, Mother claims that her income has been further reduced.

## XII.

Depending on the court's ultimate determination of the matters discussed above, the court may determine whether it is appropriate to require Father to pay all of Child's medical and dental bills as requested by Mother.

## XIII.

For the foregoing reasons, we remand this case to the court for disposition as set forth herein.

## DISSENTING OPINION OF LIM, J.

It is important to remember at all times what this appeal is all about.

Mother is appealing the family court's denial of her Motion and Affidavit for Relief After Order or Decree, which the family court denied because Mother failed to show up for the hearing *on her own Motion.*

Mother, *pro se,* personally filed the Motion. It contained an Order to Show Cause For Relief After Order or Decree, directed to Father, informing him of the date and time of the hearing on the Motion.

Mother served her Motion and Order to Show Cause upon Father. Mother later signed a Stipulation continuing the hearing on her Motion to November 5, 1998, at 8:30 a.m.

Indubitably, then, Mother knew when her Motion was to be heard by the family court.

Mother, who resided in Arizona at the time set for hearing, knew that the family court would not entertain telephone testimony at the hearing.

Indubitably, then, Mother knew that she must be present at the hearing on her Motion to seek her relief.

Mother was also advised by the family court that it might consider any affidavits or other documents she might wish to file in support of her Motion, subject to objection from the other parties.

Mother did not show up for the hearing on her own Motion. Nor does the record contain any indication she submitted further affidavit or testimony in support of her Motion.

What, pray tell, is a family court to do?

In the Motion, the family court was faced with issues regarding visitation, visitation expenses, child support and a restraining order prohibiting Mother from removing her child from Honolulu.

All of these issues centered around a child in the throes of puberty, in the context of a decade-long series of contentious litigations, which at various times involved her parents in allegations and recriminations of deceit, financial chicanery, physical and mental illness, drug abuse and attempted suicide.

These are extremely difficult and perilous issues for any court, even with all concerned

---

11. The obligations prior to 1998 amendments to the guidelines are properly calculated by using the 1994 Guidelines.

parties, witnesses and experts present to be heard.

Natural inclination and common sense dictate that when the family court is confronted with such a delicate situation and Mother does not even bother to show up to prosecute her own Motion, thus depriving the court of the desiderata of her presence, demeanor, testimony and arguments, Mother should be defaulted and her Motion denied.

This is what the family court did. And it was well within the court's discretion to do. *Bettencourt v. Bettencourt,* 80 Hawai'i 225, 232, 909 P.2d 553, 560 (1995).

And it was the right thing to do.

It would have been imprudent for the family court to consider changing the terms of the child's rights to support and visitation with both her natural parents without Mother present to explain exactly what the problem was, what the surrounding circumstances were and what the appropriate disposition should have been.

To do so would have been to blindly consider. I venture to say that in doing so the family court would have been remiss in its obligations to the best interests of the child.

The default and denial prejudiced no one.

No issues were decided with prejudice by the denial, for in the best interests of the child no issues pertinent to the best interests of the child can be permanently decided.

If still desirous of relief, Mother can easily file again, utilizing the same preprinted family court form she utilized for the instant Motion, filled out, filed and served in the same willy-nilly fashion which succeeded in getting her Motion scheduled for hearing in the first place.

And by her recent move to Hawai'i and her own admission, Mother has the wherewithal to attend the hearing on a renewed motion, if she so deigns.

Despite issues so enmeshed in the totality of human circumstances and so dependent for resolution upon the demeanor and credibility of the parties, the majority opinion blithely concludes that the *paper record* was sufficient for the family court to have ruled upon Mother's Motion.

On this insouciant conclusion let me eschew the easy target of the visitation issues.

Instead, to hand, the issue of child support.

If, as believed by the majority, the paper record was sufficient for decision, then the child support issue should have been completely resolved in the majority opinion, at least on a presumptive basis, down to the dollars and cents and the months owing or not owing, because the problem is merely one of applying the majority opinion's principles to the financial information in the paper record, and a simple one if that paper record is indeed sufficient for a ruling.

That the majority opinion must struggle with evidentiary lacunae and grouse about mathematical errors and ultimately fail on a sum-certain basis belies its conclusion that the family court should have ruled. For the paper record before us on appeal is the whole record that was before the family court at the hearing on the Motion.

In the easiest case of the child support issue, the proof is in the pudding, and the majority opinion cannot serve.

If we, in the fullness of time for review, research and contemplation cannot, then surely the family court could not. And we should not expect the family court to rule on such a deficient paper record, for even child support has human aspects beyond pure mathematical calculation.

I would affirm the family court's denial of the Motion.

By the same token, I would reverse the further restrictions placed by the family court upon Mother's visitation arrangements in its November 13, 1998 Order Denying Motion and Affidavit for Relief After Order or Decree, which appear to be restrictions imposed on an *ex parte* basis, there being

nothing in the record concerning such restrictions in the way of a motion or service thereof upon Mother.

Instead, the majority opinion carves out a new rule regarding social security disability payments and child support, and remands the case to the family court for disposition in light of its holding.

The new rule, about which I express no opinion, appears to be a new breed of holding. Holdings have traditionally derived their substance from the affirmation or reversal of a specifiable lower court decision. As if by spontaneous generation, this holding has emerged out of the substantive void of a default denial by the family court.

In essence, the majority opinion arrogates to itself the task of trying the case on the appellate record, remanding to the family court only when it can go no further in applying facts available in the record to its new rule of law.

I would prefer the family court try the case if Mother again presses the issues, as it is its job to do. Then we can review if a party asserts an appeal.

This is, perhaps, a less efficient process than the proactive course taken by the majority opinion, but as far as I can tell it is the accepted and established one.

It may very well be the better one.

Our review would than have the benefit of a complete record, including the testimony, documentary evidence and arguments of all parties concerned, as well as the family court's assessment of their demeanor and credibility, and its detailed findings of fact and conclusions of law thereon, all of which we sorely missed in this appeal.

Furthermore, if we had adhered to the traditional approach, we might have avoided the curious situation now faced by the family court.

We have remanded to the family court with instructions. It has a new rule to apply in a case we have resurrected before it. But it still lacks what it lacked before, Mother's live presence, and must somehow bring Mother, not to mention Father, before it for a hearing as yet unscheduled.

The family court could ask Mother to schedule and notice the remand hearing, but if history is indeed an oracle the punctilios might suffer.

Perhaps the family court could itself schedule and notice the remand hearing. I am all for our emphasis upon customer service, but while not unprecedented, the spectacle of the family court on its own initiative serving Mother with notice of the date and time of remand hearing of her own Motion strikes me as a bit unnerving.

Perhaps the family court could prevail upon Father to schedule and notice Mother on the remand hearing, but that might be too much salt in too many old wounds.

Most unnerving is the possibility that, after an enormous expenditure of resources in the family court, on appeal and then on remand, a remand hearing is finally, somehow scheduled and all parties noticed, and Mother again fails to show. She did not attend her own party. What makes us think she will attend ours?

I suppose it would be too Swift to suggest that the family court could then order Mother to attend, and upon further default find her in contempt and then jail her.

What, pray tell, is a family court to do?

I respectfully dissent.