25 P.3d 60

**CHILD SUPPORT ENFORCEMENT AGENCY, State of Hawai'i, Respondent/Petitioner–Appellee,**

v.

**Jane ROE, Petitioner/Respondent–Appellant.**

and

**John Doe, Defendant.**

No. 22278.

Supreme Court of Hawai'i.

June 5, 2001.

Marrionnette L.S. Andrews, for petitioner/respondent-appellant Jane Roe, on the writ.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Amended Opinion of the Court by ACOBA, J.

We granted the application for a writ of certiorari of Petitioner/Respondent–Appellant Jane Roe (Mother)[1] on February 26, 2001, to review the January 23, 2001 memorandum opinion by the Intermediate Court of Appeals (the ICA), *Child Support Enforcement Agency v. Roe*, No. 22278, 95 Hawai'i 244, 20 P.3d 677 (Haw.Ct.App. Jan. 23, 2001) (mem.) [hereinafter "the ICA's opinion"], which affirmed the November 27, 1998 decision and order of the family court of the first circuit (the court) and its January 25, 1999 order denying Mother's motion for reconsideration.[2]

We reverse the ICA's opinion in part as to its affirmance of: (1) the court's findings regarding Mother's past child care expenses, past child support obligation of Defendant John Doe (Father), and Father's ownership of certain real property; (2) the court's failure to address the question of sanctions against Father for his failure to obey a court order requiring him to provide information concerning his real estate holdings; and (3) the court's denial of Mother's motion for reconsideration. We affirm the ICA's opinion in part as to its conclusion that no further hearing was necessary for one·of Father's properties.

We vacate the aforesaid decision and orders of the court as to the amount of past and current child support obligations of Father, the amount of his debt to the State of. Hawai'i Department of Human Services (DHS), and the income to be imputed from his ownership of certain real property. We remand those issues and instruct on remand that the court also address the question of sanctions. In all other respects, we affirm the November 27, 1998 decision and order.

I.

Child was born to Mother and Father on June 22, 1993. Mother filed a· petition for paternity against Father on February 11, 1994 in FC–P No. 94–0161. The petition prayed for adjudication of paternity, custody, past and present child support in the amount of $220 per month, and medical insurance coverage for Child. Father, in his March 17, 1994 answer, agreed that he was Child's father. Accordingly, Child's paternity was undisputed.

On April 8, 1994, a pretrial/trial hearing was held in FC–P No. 94–0161. At the hearing, Mother's counsel stated that Father had agreed "to put [Child] on his health and dental insurance" and to pay child support according to the Child Support Guidelines (CSG),[3] but counsel would "re-calculate the

---

1. For the purpose of preserving confidentiality, Petitioner/Respondent–Appellant Jane Roe is referred to as "Mother," the subject child is referred to as "Child" and Defendant John Doe is referred to as "Father."

2. Family court judge Darryl Y.C. Choy was the presiding judge on pretrial matters, per diem

family court judge Loralyn Cramer presided over the trial, and circuit court judge Daniel T. Kochi decided the motion for reconsideration.

3. "Hawai'i law invests the family court with authority to establish child support guidelines" under Hawai'i Revised Statutes (HRS) § 576D–7(a) (Supp.2000). *Child Support Enforcement Agency*

figures ... contained in [the] petition ... [because Mother made] more money." The court confirmed the agreement with Father. It noted that Father was "paying child support already." Father also agreed to the award of Child's legal and physical custody to Mother and to visitation schedules described by Mother's counsel. Accordingly, custody and visitation were undisputed.

At the end of the hearing, Mother's counsel indicated that he would prepare a written judgment within ten days, pursuant to the agreement. Although the proceedings were transcribed, Mother's counsel failed to prepare a judgment and the court never entered a judgment in FC–P No. 94–0161. There is no evidence in the record that a recalculation was performed according to the CSG. Nonetheless, Mother apparently retained custody of Child and according to Mother, Father paid $200 per month beginning in January or February 1994, $375 per month starting in January or February 1995, $434.50 in June or July 1997, and $250 for the following month.[4] Father then discontinued making payments to Mother.

When asked whether he recalled how the amount of child support was determined, Father responded, "I think [Mother]'s attorney told me to pay her two hundred dollars a month so we agreed to that." Asked whether he knew "if the child support family formula was used to make up the recommended amount[,]" Father testified, "I don't think it was. [Mother's counsel] just told me to pay—pay [Mother] two hundred dollars a month." Nothing in the record indicates that Mother otherwise attempted to enforce Father's child support payments.

## II.

### A.

On February 6, 1998, Respondent/Petitioner Appellee Child Support Enforcement Agency of the State of Hawai'i (CSEA) filed a petition for paternity under HRS chapters 584[5] and 576D[6] against Mother and Father in FC–P No. 98–0121. In the petition, CSEA requested in pertinent part that the court (1) establish paternity, (2) grant custody to Mother and reasonable visitation rights to Father, and (3) order Father (a) to pay expenses of Mother's pregnancy and Child's birth, (b) to provide medical insurance coverage for Child, (c) to pay child support from the time of birth or the filing of CSEA's petition, whichever was deemed appropriate, until Child reached eighteen years of age, and (d) to reimburse DHS for welfare assistance provided to Mother.

The court held a hearing on CSEA's petition on February 27, 1998. At the hearing, Father acknowledged, as he had before, that he was Child's father. Father also testified that he worked at a sundries business owned by his parents, lived with his girlfriend in a

---

*v. Doe,* 92 Hawai'i 276, 279–80, 990 P.2d 1158, 1161–62 (App.1999). HRS § 571–52.5 (1993) provides that "[w]hen the court establishes or modifies the amount of child support required to be paid by a parent, the court shall use the guidelines established under section 576D 7, except when exceptional circumstances warrant departure." The CSG in effect were the March 15, 1991 guidelines. The 1991 guidelines were later amended on November 1, 1994 and on November 1, 1998. *See id.* at 281, 990 P.2d at 1163.

4. The changes in monthly child support payment apparently reflect Father's payment for one-half of Child's pre-school tuition from January or February 1995 to June or July 1997.

5. HRS chapter 584 is entitled "Uniform Parentage Act." HRS § 584–6 (1993) provides in pertinent part as follows:

   **Determination of father and child relationship; who may bring action; when action may be brought; process, warrant, bond, etc.** (a) ... [T]he child support enforcement agency[ ] may bring an action for the purpose of declaring the existence or nonexistence of the father and child relationship within the following time periods:

   . . . .
   (2) If the child has not become the subject of an adoption proceeding, within three years after the child reaches the age of majority....

   . . . .
   (b) When an action is brought under this section, process shall issue in the form of a summons and an order directed to the alleged or presumed father, the mother[,] or both, requiring each to appear and to show cause why the action should not be brought.

6. HRS chapter 576D is entitled "Child Support Enforcement."

house owned by his parents on property located in Hau'ula at 54–060 Kamehameha Highway (the Hau'ula property),[7] and paid $250 per month in rent. According to Father, the house had been previously rented at $1,000 per month for three months. Based on this information, the court determined that the fair market rent for the house should be at least $600 a month and imputed $350 per month to Father as additional income.

When CSEA asked Father if he owned any properties, he replied that he did not, but that he was on the titles to some of his parents' properties. Father declared that he would have to ask his parents about the number of such properties.

Mother, a college student at the time, testified that she had been paying $350 per month for child care expenses, but that the amount would increase to $425 per month on the Monday after the hearing. CSEA requested the court to calculate child support payments based on the CSG[8] and the information given by Mother and Father, and to hold a further hearing to verify Father's financial information.

The court ordered Father to pay $650 per month in child support beginning April 1, 1998 and to secure medical insurance for Child. The court noted that the child support ordered was modifiable and reserved the issue of past child support pending further financial information to be provided by Father.

CSEA requested both Mother and Father to provide financial information:

> [CSEA's COUNSEL]: ... [B]y May 21[, 1998,] both parties supply to [CSEA] an asset and debt statement....
>
> ....

That father provide to us all-we ask for taxes, going back to date of birth of [Child] and ... *a listing of properties, ... the location of the properties as well as who else is on the title and the way the title is held.*

THE COURT: *Very well.*

So, [Father], what you need to do is your parents need to pull out their deeds. If you're not on, you're not on. You're on, how are you on?

[CSEA's COUNSEL]: *We would like this going back to 1997,* [Y]our Honor.

THE COURT: *Sure.*

[CSEA's COUNSEL]: We would like to see if they have made any past changes.

THE COURT: And any—any property that you [may] be on[,] you may be contingently named, but you don't own anything until they die.

If it is then you just—just tell us how you hold the property.

[FATHER]: Can I just tell them to take my name off all the property that I'm on?

THE COURT: They can always do that. Your parents can do whatever they want.

[CSEA's COUNSEL]: But if (indiscernible, [CSEA's counsel] runs words together)....

THE COURT: *But if you're on they want to know if you're on now.*

(Emphases added.)

As to Father's visitation rights, Mother stated that she preferred the schedule recommended by an expert[9] over a "Type A" schedule.[10] Father agreed. This schedule differed from what was agreed to in FC–P. No. 94–0161.

---

7. The Hau'ula property consists of four lots: the lot with the sundries store, the lot with the house Father lived in, the lot with a "broken down house which nobody occupies," and the lot with a storage shack.

8. The CSG in effect were the November 1, 1994 guidelines. The 1994 guidelines were amended on November 1, 1998, which became effective on January 1, 1999. *See Doe,* 92 Hawai'i at 281, 990 P.2d at 1163.

9. Under the schedule recommended by the expert, Father would be entitled to visitation on the second and fourth Sundays of each month from 10 am to 2 pm.

10. The Type A schedule, which is used in "cases where parents' skills and circumstances are nearly equal," provides that a child will spend alternate weekends with each parent.

## B.

Before the end of the hearing, CSEA explained to the court that Mother and Father had been involved in the paternity suit previously filed by Mother in FC–P No. 94–0161 and that the parties were "in agreement that FC–P No. 94–0161 can be dismissed." The court responded, "We'll dismiss it and *put everything in this case.* Rather than have two cases we'll just have one case." (Emphasis added.) The court filed an order of dismissal without prejudice of FC–P No. 94–0161 on March 4, 1998, stating that the "action is dismissed without prejudice because[ ] a paternity action was commenced in FC–P No. 98–0121 involving the same parties and subject and child."

On March 4, 1998, the court also filed a judgment with respect to the February 27, 1998 hearing, which in pertinent part temporarily ordered Father to pay $650 per month for child support and reserved the issue of past child support. In the judgment, the court reiterated the obligation to provide financial information:

> X .... Mother and Father shall submit the following:
>
> X Income and Expense [and] Asset and Debt Statements by May 21, 1998.
>
> ....
>
> X Further Orders: Father shall provide *by May 21, 1998* the following: (1) *list*

6. Real Property

| Address | Fee or Lease | Title (H,[11] W, J) | Date of Acquisition |
|---|---|---|---|
| Kaa[a]wa [12] | Fee | H | |
| Hauula | Fee | H & Parents | 1990 |

| Cost | Current Gross Value | Total Debt Owed |
|---|---|---|
| ? | ? | ? |
| ? | | –0– |

The court ordered the parties to appear on May 28, 1998 for Father's motion for relief.

As ordered, Father's counsel turned over Father's tax returns to CSEA and Mother, but only immediately before the hearing started on May 28, 1998. At the hearing,

> *of all propert[ies] that Father's name appears on the title. The list shall include the present value of the propert[ies], the location of the propert[ies], number of people on the title[s,] and how title[s are] held. The list shall include all propert[ies] held in the years 1993, 1996–1998* [and] (2) tax returns filed since 1993.

(Emphases added.) We note that the value of Father's properties may have been relevant under the CSG, which provided that "[w]here a parent has inadequate income to meet his/her support obligation but owns assets, he/she may be required to convert all or some portion of said assets to cash for payment of support." 1994 Guidelines, General Provisions Regarding Income (citing *Cleveland v. Cleveland,* 1 Haw.App. 187, 616 P.2d 1014 (1980)).

## III.

On April 22, 1998, Father filed a motion and affidavit for relief after order or decree, requesting the court to modify the March 4, 1998 judgment by granting Father Type A visitation and by reducing his monthly child support payments from $650 to $300. Father also filed an income and expense statement and an asset and debt statement. The latter indicated that Father owned the following real properties:

Father's counsel related that Father held a one-fifth interest in the Ka'a'awa property and an undivided one-third interest in the Hau'ula property. However, Mother's counsel disputed this statement, noting that her title search revealed Father owned a one-half

---

11. "H" refers to Father.

12. While some of Father's documents state "Kaawa," the correct spelling of that word is "Ka'a'awa."

share in the Hauʻula property. CSEA complained that the deadline for providing financial documents was May 21, 1998, that until the hearing it had received "nothing," that Father's conduct led "to the impression that . . . he will only . . . admit to what properties we can find[,]" and that the parties were "not getting this information ahead of time as ordered by the [c]ourt." The court responded that because "the statement by [F]ather [was] under oath[,] . . . he's held to it subject to contempt or perjury that he owns nothing else."

Mother's counsel then informed the court that a cursory title search had revealed that on May 5, 1998, Father transferred property located in Kalihi to his brother. This property had not been listed on Father's asset and debt statement. Father's counsel stated that "[he]'d be happy to respond." The court moved on to the visitation issue without allowing Father's counsel to explain.

After discussing the visitation issue, the court set the trial for August 24, 1998. Father's counsel noted that he wanted to avoid a trial and that he would explain the question of the Kalihi property "very quickly," but the court responded that "for you to convince me to limine that issue may be a bit unfair at this point."

Mother's counsel also advised that "because [Father]'s making us do all this extra work, [Y]our Honor, I'm gonna propose that they pay my attorney's fees[.]" The court did not respond to this statement, but stated, " 'Cause this Kalihi property, [Mother's counsel] brought that stuff out. That looks pretty rotten. I'm sure [Father's counsel] has a good explanation for it. And if it is, then we need to hear it."

CSEA requested an absolute deadline for Father to submit his real property information "subject to fees and costs." The court agreed and set the deadline for the exchange of documents for July 2, 1998.

As to Father's visitation rights, the court noted its inclination to order the Type A

schedule to Father eventually and reserved that matter for the August 24, 1998 hearing.

On June 2, 1998, the court filed an order relating to visitation and the trial date. The court ordered, *inter alia*, that "Father shall provide the property list *as ordered by the judgment filed March 4, 1998.* The list shall be turned over to the other parties by *July 2, 1998.*" (Emphases added.)

In response to the June 2, 1998 order, Father apparently submitted an updated list which stated as follows:

Real Properties Held By [Father]

1. 322 Kalihi St., Honolulu, Hawaii
   A) Acquired: 11/5/97
   B) Current value: to be provided
   C) Names on title: [Father's brother]
   D) Title held: Tenant in Severalty
2. 54–060 Kam Hwy., Hauula, Hawaii
   A) Acquired: 10/11/90
   B) Current value: $565,300
   C) Names on title: [Father's father]
   [Father's mother]
   [Father]
   D) Title held: Tenants in Common
3. 51–580 Kam Hwy., Kaaawa, Hawaii
   A) Acquired: 8/22/97
   B) Current value: $15,300
   C) Names on title: [Father and 5 others]
   D) Title held: Tenants in Common

## IV.

At the August 24, 1998 trial, CSEA explained to the court that "[FC–P No. 94–0161] was dismissed because CSEA filed its petition therefore, we had two petitions concurrently appearing. Therefore, it was agreed by the parties that for simplicity sake that basically the '94 case would be dismissed because the CSEA case would then cover all issues." [13]

Mother testified that she was unemployed, being a full-time student. Mother's Exhibit No. 18 indicated that for child care expenses,

---

13. Mother's counsel stated that "[FC–P No. 94–0161] was dismissed the last time and so it had to be refiled." This statement is inaccurate because CSEA filed FC–P No. 98–0121 on February 6, 1998 before the court "dismissed" FC–P No. 94–0161 on March 4, 1998.

she had paid $4,158 in 1995, $4,654 in 1996, $4,158 in 1997, and $3,025 for eight months in 1998. Mother declared that Child would be enrolled at a community day care center beginning September 1998. A pamphlet for after-school services at the center quoted a monthly fee of $66. Mother reported that she began to receive $650 per month in July 1998 from "CSEA."

Father testified that he was listed as an owner of the Hau'ula property, no one paid rent on the store located there, and, thus, he did not receive any income from the property.

As to the Ka'a'awa property located at 51–580 Kamahameha Highway, Father reported that he was one of the owners, that the "front" house was rented for $1,000 per month, and that if he receives "a check for nine hundred dollars from the realtors[,] ... the realtor[s] take[ ] ten percent[, a]nd [he] write[s] a check back to [his] dad for a thousand dollars." Father did not explain why he wrote a check to his father for $1,000 instead of $900.

Mother's counsel asked Father if there was another piece of real property in Ka'a'awa "located at 51–594 Kamehameha Highway." This question was based on an August 25, 1997 promissory note in which Father had agreed to pay his parents $159,000 "upon the sale by [Father] ... of [his] 1/5th interest in that [property]." Father responded, "I don't know. Maybe there was a type [sic] error. I'm not sure."

As to the Kalihi property, Father testified that he did not believe he had ever owned that property. Although his name was on

the title for two months, he related that he did not pay anything for it.

Because the court had another trial scheduled, it ordered all parties to submit written closing arguments by September 16, 1998. As to visitation rights, the court ordered that effective November 1, 1998, Father would have visitation rights based on the Type A schedule and, until then, Father's visitation was set for certain hours on every other Sunday.

On September 15, 1998, CSEA and Father filed their closing arguments. In its closing argument, CSEA contended that Father owed DHS $7,106 [14] in past child support [15] but did not take any position on Father's past child support owing to Mother. CSEA also related that "[b]ecause paternity and child support issues were not fully resolved, FC–P No. 98–0121 was filed on 02/06/98 which incorporated FC–P No. 94–0161."

Father argued, *inter alia*, that CSEA's request for reimbursement to DHS should be denied because DHS's public assistance was paid both to Child and Mother but CSEA could not establish how much was paid for Child.

In her September 16, 1998 closing argument, Mother requested that the court (1) enter a temporary judgment against Father in the amount of $32,440 for his past child support obligation from June 22, 1993 to August 1998 [16] (the amount due after credit for Father's and DHS's payments) and in the amount of $690 per month in child support beginning September 1, 1998, (2) order a further hearing for determination of Father's real estate interests and income, and (3)

14. The amount stated as owing to DHS was not consistent.

15. The total owed to DHS consisted of $4,275 in Aid to Families with Dependent Children (AFDC) benefits and $2,831 in food stamps, which DHS provided Child from September 9, 1997 to May 31, 1998.

AFDC is a program "established by Title IV of the Social Security Act, 42 U.S.C. §§ 601–613, and designed to provide financial assistance to needy dependent children and the parents or relatives who live with and care for them[.] ... It is financed in large measure by the [f]ederal [g]overnment on a matching-fund basis[.]" *Cu-*

*dal v. Sunn*, 69 Haw. 336, 340, 742 P.2d 352, 355 (1987) (internal quotation marks and citations omitted).

16. For past child support, Mother requested $540 per month in 1993, $520 per month in 1994, $700 per month in 1995, $680 per month in 1996, $700 per month for the first five months in 1997 and $750 for June 1997, $960 per month for the last six months of 1997, and $1,050 per month for the first eight months in 1998. From the total amount allegedly owed, Mother deducted Father's child support payments of $2,400 per year for 1994, 1995, and 1996, $1,450 for 1997, and $3,555 per year CSEA paid for 1997 and 1998.

award attorney's fees and costs resulting from Father's failure to submit documents ordered by the court.

### V.

On November 27, 1998, the court issued a written decision and order. That decision and order ruled in pertinent part that: (1) Father owed Mother $16,783 in past child support from Child's birth to August 1997 and from June 1998 to August 1998, attributing $66 as Child's monthly expenses from 1995 to August 1998; (2) additional income to Father for the Ka'a'awa property be imputed at $180 per month rather than the $900 monthly rent received;[17] (3) Father reimburse "CSEA"[18] $5,763 for past child support from September 1997 to July 1998;[19] and (4) Father pay $655 per month in child support until Child reached the age of eighteen or graduated from high school. The decision and order did not address the possible existence of property located at 51–594 Kamehameha Highway and Mother's request for an award of attorney's fees and costs.

Mother filed a motion for reconsideration of the October 29, 1998 minute order on November 18, 1998, urging the court to consider actual child care expenses in determining past child support and to ascertain Father's interests in the Hau'ula, Kalihi, and Ka'a'awa properties and the possible property at 51–594 Kamehameha Highway. Mother also reiterated her demand for attorney's fees and costs, for the first time referring to Hawai'i Family Court Rules (HFCR) Rules 34 and 37. Father did not file a motion for reconsideration.

### VI.

On December 18, 1998, Father filed a notice of appeal which was dismissed as premature. On January 25, 1999, the court denied Mother's November 18, 1998 motion for reconsideration. On February 11, 1999, Mother filed a notice of appeal. On April 1, 1999, Father filed a second notice of appeal, which was subsequently dismissed as untimely.

### VII.

Mother raised the following points on appeal: (1) the court erred in finding that Mother had paid $66 per month for child care expenses in 1995,[20] 1996, 1997, and the first eight months of 1998, rather than the actual child care expenses she incurred; (2) the court erred in finding that Father received $180 instead of $900 per month as rental income from the Ka'a'awa property; (3) the court erred in failing to use Mother's actual child care expenses and Father's actual rental income in determining past and present child support; (4) the court abused its discretion in failing to determine Father's interests in the Hau'ula, Ka'a'awa, and Kalihi properties and the possible property at 51–594 Kamehameha Highway; (5) the court abused its discretion in failing to decide the question of sanctions; and (6) the court abused its discretion in denying her motion for reconsideration.

In its answering brief, CSEA asked that the November 27, 1998 decision and order as to Child's paternity and child support Father owed to DHS be affirmed. CSEA did not take any position on custody, visitation, and any debt owing between Mother and Fa-

17. In Finding No. 12, the court imputed an additional $1,300 as Father's income. While the court does not specifically indicate so, we assume that this imputed income is for the Hau'ula and Kalihi properties.

18. While the court and the parties at times referred to "CSEA," the amount due was owed to DHS.

19. The court used Father's monthly child support obligation for that period to calculate the amount Father owed DHS for reimbursement.

20. Mother contends that the court erred in finding that she paid a total of $66 for child care expenses in 1995. While the court's Finding No. 19 states that "Mother paid $66.00 in child care expenses for [Child] in the year 1995[,]" Finding No. 22 states that "Mother's child care expenses *remained at $66.00 per month* for the year 1996." (Emphasis added). Furthermore, the numbers for child support obligations for 1995 suggest that the court calculated child support based on child care expenses of $66 per month. While the court could have been more accurate in describing its finding, the record suggests that the court found Mother paid $66 per month instead of a total of $66 for child care expenses in 1995.

ther.[21] CSEA agreed with Mother that the Ka'a'awa $900 per month rent should be included as part of Father's income [22] and Father's present child support obligation adjusted accordingly.

## VIII.

In its memorandum opinion, the ICA concluded that: (1) the court's $66 findings regarding Mother's child care expenses were erroneous, but correcting the error "would add to Mother's windfall," ICA's opinion at 33, in light of Father's past support payments and what it viewed as the court's unauthorized award of past child support, *see id.* at 29–33; (2) the finding establishing Father's portion of the Ka'a'awa rental income at $180 per·month was not clearly erroneous because it was proportional to Father's one-fifth ownership in the property, *see* ICA's opinion at 34; (3) a future hearing to determine Father's property interests and corresponding child support adjustment was not necessary because the parties had had three separate hearings in which to do so, *see* ICA's opinion at 35; (4) Mother's sanction request need not be considered because (a) Mother never filed a written motion therefor, *see* ICA's opinion at 36; (b) the time allowed for trial ran out, *see id.;* and (c) Father did submit a list of his real properties, *see* ICA's

opinion at 37; and (5) based on the foregoing, the court properly denied Mother's motion for reconsideration. *See id.*

## IX.

In her application, Mother contends that (1) the ICA erred in sustaining the court's $66 figure to calculate past child support; (2) a further hearing is necessary because Father did not fully inform Mother and CSEA as to his actual real estate interests; and (3) the record warrants sanctions against Father and his counsel.

## X.

■ As Mother points out, a judgment was never entered in FC–P No. 94–0161. The record indicates that Mother's counsel represented to the court that he would prepare a judgment but never did so. HFCR Rule 58(a) provided that the trial court "may" direct any party, through his or her attorney, to prepare an appropriate decree or order in accordance with the decision and that the decree or order be "submit[ted] . . . to the court for its approval." [23] The present version of HFCR Rule 58(a) mandates the prevailing party, unless otherwise ordered by the court, to prepare an order or judgment in accordance with the courts' decision.[24] Pa-

21. While CSEA requested a deadline for Father's submission of his real property information "subject to fees and costs[,]" it did not request attorney's fees and costs in closing argument or on appeal.

22. CSEA admits that it had argued for $180 per month at the trial.

23. HFCR Rule 58(a) (1982) provided as follows:
    **PREPARATION AND SIGNING OF DECREES AND ORDERS. (a) Preparation of Decree and Order.** Upon the entry or announcement of a decision of the court in any contested matter, the court *may* direct any party through his [or her] attorney to prepare an appropriate decree or order in accordance with the decision. In the event one party so directed fails to prepare such a decree or order and present the same to an opposing party or parties ... if he[, she,] or they are not represented by an attorney for approval as to form within 10 days, any other party through his [or her] attorney may prepare such decree or order and submit the same to all other parties for approval as to form. Upon approving the de-

cree or order as to form, the attorney for the party or the party approving the same shall forthwith *submit the decree or order to the court for its approval.*
    . . .
(Emphases added.)

24. HFCR Rule 58 (2000) provides as follows:
    **(a) Preparations of Judgments and Other Orders.** Within 10 days after entry or announcement of the decision of the court, *the prevailing party,* unless otherwise ordered by the court, *shall prepare a judgment or order in accordance with the decision* and secure thereon the approval as to form of the opposing counsel or party (if pro se) and deliver to the court the original and necessary copies, or if not so approved, serve a copy thereof upon each party who has appeared in the action and deliver the original and copies to the court. Any party objecting to a proposed judgment or order shall, within 5 days after receipt, serve upon all parties and deliver to the court that party's proposed judgment or order, and in such event, *the court shall proceed to settle the judgment or order.*

ternity, custody, visitation rights, and medical insurance coverage had been agreed to on April 4, 1994 in FC–P No. 94–0161, and the parties had apparently adhered to some aspects of that agreement. The failure in 1994 to timely enter a judgment suspended the legal determination of paternity of Child and related matters for nearly four years. Moreover, claims already agreed to in 1994 were required to be relitigated in 1998.[25] Since a trial court ultimately signs the judgment, it is responsible for ensuring that its orders and judgments are entered. To protect the rights of the parties appearing before it and to prevent gaps in the record, trial courts should monitor orders and judgments which become outstanding because of counsel's failure to prepare them.

■ Of course, the trial courts may impose appropriate sanctions on counsel for having failed to prepare orders or judgments as directed by the court or as required. *See State v. Gonsales*, 91 Hawai'i 446, 449–50, 984 P.2d 1272, 1275–76 (App.1999) (per curiam) (holding that where counsel fails to comply with a court's directive to prepare written findings and conclusions as agreed to, appropriate sanctions should be imposed). Subsection (b) of HFCR Rule 89, adopted for "expedition of court business[,]" would authorize such sanctions and provides that "[a]n attorney who, without good cause, fails to submit documents in a timely manner in accordance with these rules, or who fails to adhere to these rules or applicable statutes, may be subject to such sanction as the court deems appropriate."

## XI.

■ We believe the ICA erred in the instances discussed *infra* in applying the standards of review that follow. "The trial court's findings of fact are reviewed under the clearly erroneous standard[.]" *Gump v. Wal–Mart Stores, Inc.*, 93 Hawai'i 417, 420, 5 P.3d 407, 410 (2000) (citing *Brown v. Thompson*, 91 Hawai'i 1, 8, 979 P.2d 586, 593, *cert. denied*, 528 U.S. 1010, 120 S.Ct. 511, 145 L.Ed.2d 395 (1999)). "A [finding of fact] . . . is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made." *In re Water Use Permit Applications*, 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000) (citing *Leslie v. Estate of Tavares*, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999)). " '[S]ubstantial evidence' [is] credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Id.* (internal quotation marks and citations omitted). "[A] trial court's conclusions of law [are reviewed] de novo, under the right/wrong standard of review." *State v. Ah Loo*, 94 Hawai'i 207, 209, 10 P.3d 728, 730 (2000) (citing *Leslie*, 91 Hawai'i at 399, 984 P.2d at 1225 (citations omitted)).

## XII.

■ Preliminarily, we note that at the August 24, 1998 hearing, Father argued that Mother should not be entitled to past child support in FC–P No. 98–0121, because CSEA, and not she, had initiated the petition. CSEA's petition in FC–P No. 98–0121 did request child support from Child's birth. The court pointed out that Father failed to object to this claim prior to the trial. We conclude that Father had ample notice from CSEA's petition that Child's support "from [Child's] birth" was an issue in the case and

(Emphases added.)

25. None of the parties moved for entry of a judgment nunc pro tunc in FC–P No. 94–0161. "The Latin Phrase, 'nunc pro tunc' is merely descriptive of the inherent power of a court to make its records speak the truth, i.e., to record that which . . . actually [occurred]," but was erroneously omitted or recorded. *Simmons v. Atlantic Coast Line RR Co.*, 235 F.Supp. 325, 330 (E.D.S.C.1964). Hawai'i courts have the inherent power to amend [their] records to correspond to the actual facts, *i.e.*, correct a clerical error. *See e.g., City and County of Honolulu v. Caetano*, 30 Haw. 1 (1927); *Wong v. Wong*, 79 Hawai'i 26, 29, 897 P.2d 953, 956 (1995).

*Korsak v. Hawaii Permanente Medical Group*, 94 Hawai'i 297, 304 n. 5, 12 P.3d 1238, 1245 n. 5 (2000).

thus he was not prejudiced.[26] *See In re Doe*, 91 Hawai'i 166, 178, 981 P.2d 723, 735 (App. 1999) (rejecting a father's contention that neither harm nor threatened harm to a child was properly alleged in a child protective proceeding inasmuch as father failed to point to any prejudice to him and had ample notice of the purported harm to the child).

### XIII.

■ In rejecting Mother's actual-child-care-expenses contention, the ICA posited that if Mother's counsel had prepared an order or judgment in FC-P No. 94-0161 and "Father's $200 monthly child support obligation had been established by court order, HRS § 576E-14 [ (Supp.2000) ] would have prohibited [a] retroactive modification of Father's obligation." ICA's opinion at 32-33. The ICA relied on the following language in HRS § 576E-14(b): "Only payments accruing subsequent to service of the request on all parties may be modified, and only upon a showing of a substantial and material change of circumstances." We must agree with Mother that HRS § 576E-14 is inapplicable.

HRS chapter 576E establishes an administrative adjudicative process for child support enforcement. *See* Hse. Stand. Comm. Rep. No. 227-88, in 1988 House Journal, at 931 (stating that HRS chapter 576E was enacted "to add a new chapter to [HRS] to provide for an administrative process"); Sen. Stand.Comm.Rep. No. 2553, in 1988 Senate Journal, at 1080 (stating that the "process [would] ... relieve the Family court of a substantial portion of its child support work-load"). HRS § 576E-3 (Supp.2000) gives "the attorney general, through the [CSEA], concurrent jurisdiction with the court" to enforce child support obligations. Adminis-

trative hearings in contested cases are conducted before hearing officers in accordance with HRS chapter 576E, and when otherwise applicable, HRS chapter 91. *See* HRS § 576E-9 (Supp.2000). Hearing officers have the authority to enter various orders concerning child support enforcement, *see* HRS § 576E-10 (Supp.2000), and such orders must be filed with the clerks of the circuit court. *See* HRS § 576E-12 (Supp. 2000). A party aggrieved by a final administrative decision and order "is entitled to judicial review under chapter 91" and can appeal to the family court. HRS § 576E-9.

HRS § 576E-14 provides for "[m]odification, suspension, or termination of court and administrative orders." HRS § 576E-14(a) allows "[t]he responsible parent, [CSEA], or the person having custody of the dependent child" to file "a request for suspension, termination, or modification of the child support provisions of a Hawaii court or administrative *order* with [CSEA]." (Emphasis added.) HRS § 576E-14(b) indicates that modification of court and administrative orders pertains "[o]nly [to] payments accruing subsequent to service of the request" referred to in subsection (a) and "only upon a showing of a substantial and material change of circumstances." Thus, HRS § 576E-14(b) does not apply to this case because (1) no *request* for modification of an existing order was filed with the CSEA and (2) any request would have had to have been with respect to a pre-existing court or agency order, neither of which existed in this case.

### XIV.

■ Also, according to the ICA, because Father's appeals were dismissed,

---

26. We note that in his September 15, 1998 closing argument, Father also contended as follows:

> [Father]'s position would ... be that [Mother] is not entitled to child support contributions up to the time of filing of this [p]etition in 1998 by reason of laches and the reluctance of the [f]amily [c]ourt to award back child support if the party had not helped themselves [sic] by coming to court and taking matters to a completion of litigation.

In its November 27, 1998 decision and order, the court "ordered," following its findings, that "[u]pon all the foregoing circumstances, Father

may not rely on the defense of laches." However, the court did not designate which findings it relied on and they are not evident to us. We observe, however, that Father adduced no evidence as to laches in his examination of Mother. Father did not elaborate on these contentions any further and did not, as previously noted, file a motion for reconsideration of the court's decision and order. Neither Mother nor CSEA raised this issue on appeal and the ICA did not discuss this issue in its opinion. Under the circumstances, there is no basis to discuss it further.

Mother's child support award should remain undisturbed.

Since Mother was awarded a *retroactive* increase in child support[ ] [by the court] ... and Father's appeals from the family court's Decision and Order were *previously dismissed by the Hawai'i Supreme Court as untimely, Mother, in essence, will enjoy a windfall* as to the amount of past child support payments that Father is obligated to pay her.

ICA's opinion at 33 (emphases added). The fact that Father's appeals were dismissed did not ipso facto render the court's decision a "windfall" to Mother. An appellant must still "overcome [a] presumption of correctness" that attaches to a lower court's appealed position. *Costa v. Sunn*, 5 Haw.App. 419, 430, 697 P.2d 43, 51, *cert. denied*, 67 Haw. 685, 744 P.2d 781 (1985). Hence, the lack of an opposing brief does not necessarily mean the appellant will prevail because, ordinarily, the appellant would still have "the burden of showing that the [court's] findings of fact are clearly erroneous or the conclusions of law are incorrect" in the decision appealed. *Hawkins v. Peterson*, 474 N.W.2d 90, 92 (S.D.1991). No "windfall" can be derived from the absence of Father's opposition on appeal; the court's decision must still be reviewed for correctness as to its findings and conclusions.

### XV.

■ The record indicates that Mother paid for child care expenses of much more than the $66 per month [27] from 1995 to August 1998 found by the court.[28] The findings as to these expenses then were clearly erroneous. We observe that monthly child care expense is a component in the CSG calculation of child support. *See* 1994 Guidelines. A change in the child care expense figure will affect the total monthly child support obligation. *See id.* On remand, the court must determine Mother's actual monthly child care expense for the subject period, recalculate

the child support obligation, and deduct payments Father had made from that amount.

### XVI.

■ As to a further hearing on Father's real estate interests, Mother does not specifically dispute the court's findings with regard to the Hau'ula and Kalihi properties. Thus, the findings with respect to the Hau'ula property were not clearly erroneous and a further hearing as to that property is unnecessary. However, the court imputed additional income for every month for the Kalihi property, despite the fact that Father's ownership interest terminated after four months. While imputation for some period of time would appear reasonable in light of the court's finding that Father's transfer was "suspect," it may be unreasonable to require it for an indefinite period of time. In any event, Father should be allowed to present evidence on this issue at the hearings on remand.

■ As to Mother's contention that Father's imputed income from the Ka'a'awa property should have been $900 per month instead of $180 per month, we conclude that a further hearing is necessary. The fact that Father wrote a monthly check for $1,000 to his father after receiving the Ka'a'awa rental income of $900 is inherently inexplicable. A further hearing is necessary to establish more facts to support that amount or, if the facts warrant, to revise it.

■ Similarly, the court also should have determined whether property allegedly located at 51–594 Kamehameha Highway was in fact additional property owned by Father. Father could not explain the discrepancy between the two Ka'a'awa addresses. The court may have relied on Father's testimony that "51–594" was a typographical error, but it made no finding to that effect. On the other hand, the August 25, 1997 promissory note in evidence refers unambiguously to

---

27. The record suggests that the court mistakenly applied child care expenses beginning in September 1998, i.e., $66 per month, to child care expenses incurred prior to that date.

28. Mother's contention for recalculation based on actual child care expenses has no effect on past child support from Child's birth to December 1994 because Child began preschool in January 1995.

property at *"51–594 Kamehameha Highway,* Kaa[a]wa, Hawaii[.]"* (Emphasis added.)

The resolution of the three foregoing questions may impact Father's past and present child support obligations. The court's order to reimburse DHS was also based on the amount of child support owed by Father. On remand Father's child support obligation may change. If that occurs, the court must decide whether Father's reimbursement to DHS is to be adjusted in light of any change in his child support obligation. *See* HRS § 346–37.1(b) (Supp.2000).[29]

## XVII.

■ In her motion for reconsideration and opening brief, Mother contends that Father failed to comply with HFCR Rule 34 and thus should be sanctioned under HFCR Rule 37(a)(3) and (4). But HFCR Rule 34 concerns, *inter alia,* a request for production of documents. HFCR Rule 37(a)(3) and (4), which governs a motion for compelling discovery, is not applicable because Mother never served a request for documents on Father or moved to compel discovery.

■ However, nothing in the language of HFCR Rule 37(b) precludes the court itself from sanctioning Father. HFCR Rule 37(b)(2) provides in pertinent part that

[i]f a party . . . *fails to obey an order to provide or permit discovery,* including an order made under subsection (a) of this rule or Rule 35, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

. . . .

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

(Emphasis added.) Because HFCR Rule 37(b) refers to "an order to provide or permit discovery, *including* an order made under subdivision (a) of this rule or Rule 35" (emphasis added), the violation of a discovery order not issued pursuant to HFCR Rule 37(a) can be a basis for HFCR Rule 37(b) sanctions. Thus, HFCR Rule 37(b)(2) gives family courts discretion to sanction a party "fail[ing] to obey an order to provide or permit discovery." Of course, Mother herself could have filed a written motion seeking assessment of sanctions under HFCR Rule 37(b)(2), and generally a party seeking such sanctions should do so.[30]

Hawai'i Rules of Civil Procedure (HRCP) Rule 37(b) is identical to HFCR Rule 37(b). As a result, we may construe HFCR Rule 37 in a manner similar to our interpretation of HRCP Rule 37(b). *See Criss v. Kunisada,* 89 Hawai'i 17, 23, 968 P.2d 184, 190 (App. 1998) (applying interpretations of HRCP Rule 68 to HFCR Rule 68 on the basis that the two rules are similar). "Insofar as HRCP Rule 37(b) provides for sanctions for failure 'to obey an order to provide or prevent discovery,' the provision is inapplicable . . . where no such order was ever entered." *Fujimoto v. Au,* 95 Hawai'i 116, 165, 19 P.3d

---

29. HRS § 346–37.1(b) provides as follows:

(b) *If there is no existing court order, the debt [owed to DHS] may be established* by agreement of the parties or *by order of the family court* wherein the following criteria shall be considered:

(1) All earnings, income, and resources of the absent parent or parents including real or personal property;

(2) The earnings potential, reasonable necessities, and borrowing ability of the absent parent or parents;

(3) The needs of the child for whom the support is sought;

(4) The amount of assistance which would be paid to the child under the full standard of need as established by the department; and

(5) The existence of other dependents.

These criteria shall be applied so as to ensure, at a minimum, that the child for whom support is sought benefits from the income and resources of the absent parent or parents on an *equitable basis in comparison with any other minor child* of the absent parent.

(Emphases added.)

30. In concluding that the court did not need to address the sanction issue, the ICA relied on the fact that "Mother never filed a written motion requesting sanctions against Father." ICA's opinion at 35.

699, 748, *reconsideration denied,* 95 Hawai'i 116, 19 P.3d 699 (2001) (citations omitted). In other words, "sanctions under [HRCP] Rule 37(b) do not apply unless a prior court order for discovery has been violated." *Stender v. Vincent,* 92 Hawai'i 355, 362 n. 6, 992 P.2d 50, 57 n. 6 (2000) (citing *Glover v. Grace Pac. Corp.,* 86 Hawai'i 154, 163, 948 P.2d 575, 584 (App.1997) (holding that "to justify sanctions under HRCP Rule 37(b), there generally must be a violation of a prior court order") (citations omitted)), and *Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 507, 880 P.2d 169, 182 (1994)). In *Richardson,* this court indicated that imposition of discovery sanctions were not warranted in the absence of a formal written discovery request and even if such a request had been made, the plaintiffs should have moved to compel compliance with that request, or shown that such a motion would have been futile. *See id.*

However, in an expansion on the *Richardson* holding, this court has recently held that "when a court unequivocally and prospectively notifies a party of a discovery requirement that the court expects that party to obey, the notification may, under appropriate circumstances, be treated as the functional equivalent of an order compelling discovery, even if the court has not expressly designated it as such." *Fujimoto,* 95 Hawai'i at 166, 19 P.3d at 749. Here, there was a violation of a prior court order that was the functional equivalent of an order compelling discovery.

In the March 4, 1998 judgment, the court ordered Father to provide a "list of all propert[ies and, with respect thereto,] ... the present value ..., the location ..., [the] number of people on the title and how title is held ... [for] the years 1993, 1996–1998." As stated *supra,* despite the order, Father's April 22, 1998 asset and debt statement listed the Ka'a'awa property and the Hau'ula property, but did not contain the value of those properties, and did not list the Kalihi proper-

ty even though Father owned it before the May 5, 1998 transfer.[31] The record suggests that Father's ownership of the Kalihi property may not have been disclosed if Mother's counsel had not informed the court of Father's transfer of the Kalihi property.

On June 2, 1998, the court again ordered Father in writing to "provide the property list as ordered in the judgment filed March 4, 1998 ... by July 31, 1998." Father finally complied with the June 2, 1998 order, submitting a revised statement concerning the properties. *See supra* at 7, 25 P.3d at 66. Based on the foregoing, we conclude that Father failed to comply with the court's order contained in the March 4, 1998 judgment and that Father's failure to comply potentially subjected him to sanctions under HFCR Rule 37(b)(2). *See Fujimoto, supra.*

Mother orally raised the matter of sanctions at trial, in her written closing argument, and in her written motion for reconsideration. If the court had determined not to impose sanctions, it should have explained in its decision and order why such an award would be unjust.[32] Therefore, we instruct on remand that the court consider Mother's request for attorney's fees and costs.

## XVIII.

█ As to DHS's award, Father asserted in his closing argument that public assistance was paid to both Mother and Child, and Child's portion of such benefits was not established. CSEA maintained that DHS provided AFDC benefits and food stamps to Mother for Child's benefit. In its November 27, 1998 decision and order, the court found that "Mother received cash welfare (AFDC), food stamps, and medical insurance *on [Child]'s behalf* for the period September 9, 1997 through May 31, 1998" (emphasis added) and that "[d]uring that period, a total of $4,725.00 in AFDC benefits and $2,831.00 in

---

**31.** Contrary to the ICA's reference to Father's submission of a list, the list was incomplete. As pointed out by Mother, if the April 22, 1998 asset and debt statement had constituted compliance with the March 4, 1998 judgment, the court would not have ordered Father to provide the list on June 2, 1998.

**32.** We note that the ICA sustained the court's failure to rule on the sanction request because the court had another trial scheduled and thus " 'time had run out[.]' " ICA's opinion at 35. This cannot be a basis for denying or ignoring a request for sanctions.

food stamps were paid to Mother *for the benefit of [Child].*" (Emphasis added.) Since Mother would not have received such public assistance if not for Child, *see* HRS § 346–37.1(a) (Supp.2000),[33] the court's findings do not appear to be clearly erroneous.

## XIX.

Based on the foregoing discussion, we affirm the ICA's opinion in part as to its conclusion on the Hau'ula property, but reverse as to (1) Mother's past child care expenses, (2) Father's past child support, (3) Father's ownership of the Kalihi and Ka'a'awa properties and possible property at 51–594 Kamehameha Highway, and (4) the question of sanctions against Father. Based on the foregoing, the ICA's opinion regarding Mother's motion for reconsideration must also be reversed. We vacate the court's (1) November 27, 1998 decision as to (a) the amount of Father's past and current child support obligations, (b) the amount of his debt to DHS, and (c) the income to be imputed from the ownership of the aforementioned properties, and (2) January 25, 1999 order denying reconsideration. We remand the case for disposition consistent with this opinion.

---

33. HRS § 346–37.1(a) provides in pertinent part as follows:

> **Payment of public assistance for child constitutes debt to department by natural or adoptive parents.** (a) Any payment of public assistance money *made to or for the benefit of any dependent child* or children creates a debt due and owing to [DHS] by the natural or adoptive parent or parents who are responsible for support of such children in an amount equal to the amount of public assistance money so paid or *as established pursuant to subsection (b)*....
> (Emphasis added.)